Doosan Infracore America On the day that the legislature passed Chapter 57, Doosan had a choice. It could have told Amtec either to sign a new agreement with performance goals and a term contract which under Chapter 57 would have preserved its right to terminate the contract on notice and without good cause. Or, if Amtec refused, Doosan could have notified Amtec that it was terminating the contract, exercising its rights. And Doosan took no steps to preserve those rights before Chapter 57 took effect 75 days later. It is therefore bound by Chapter 57. The purpose of the contract clause is not to permit parties to avoid valid legislative acts. As Justice Holmes wrote more than a century ago, parties cannot remove themselves from the power of the state by signing a contract. Yet Doosan claims that by making an open-ended contract, it could avoid state regulation in perpetuity. But the Texas Constitution, and that's what's important here, preserves the legislature's right, even its obligation, I would say, to advance public policy. The legislature recognized that in passing Chapter 57, an open-ended and terminable at-will contract, that's the contract between Doosan and Amtec, will incorporate new law because the parties are constantly renewing their decision to maintain the contractual relationship. Your position, as I understand it, is that there's no retroactivity here at all. Is that right? As I understand it, retroactivity is the attachment of legal consequences to something that happened in the past. Isn't that what's going on here, that the past conduct is the original formation of the contract? The legal consequence is a future event, and that is the termination. It's not a... It's a future consequence triggered by a past act, namely they signed the contract before the law was signed. Is that correct? It is not correct, Your Honor. And I would point the Court to a recent case, the U.S. Supreme Court in Sveen, S-V-E-E-N, v. Medlin. This is a case that came out of Minnesota. The Minnesota law had a statute that voided a beneficiary choice after a divorce. And so husband and wife are married. The husband named the wife as the beneficiary in the life insurance policy. Minnesota passed a statute that says if you're divorced, that designation goes away. The wife says, what? What are you saying? We have a contract that existed beforehand, this policy, that would have given me benefits. The Supreme Court, in an 8-to-1 opinion, said, no, this is not a retroactive law, and it is not an impairment of contract. And even if it is an impairment of contract, it is a slight impairment because it could have been remedied by the parties themselves. As I understand your argument, I'm actually somewhat sympathetic to it, it's not past conduct based on the original formation of the contract. It's current conduct because the contract could have been refreshed, could have been terminated, and nobody did. They just decided to continue it, and therefore it's present conduct. Yes, and the termination happens later. So everyone was on advance notice at the time that the law was passed that you can either continue this contract as it is, or you can terminate it, or you can renegotiate it before the act comes into effect. So we're looking at the Texas Constitution. Is there any case law from the Texas Supreme Court as to whether we can look at this as a past conduct case, the time of the formation of the contract, or if we can kind of move it forward the way you're asking because it's a terminable-at-will contract? Does the Texas Supreme Court answer that question one way or the other? I say the Texas Supreme Court very much does answer the question. Union Carbide v. Sinatsky, that's a case that's cited in our case. It's a 2014 Texas Supreme Court case. This is a case in which a plaintiff died of asbestos in 2005. After the plaintiff's death, the legislature passed a law eliminating claims like the plaintiff's if they were filed more than 60 days after the law's passage. The plaintiff did not file within that 60-day period. The Supreme Court of Texas held that because of this grace period, just like we have the 75-day grace period under Chapter 57, the law's retroactive application would be constitutional. It is not any kind of impairment. The plaintiff, quote, could not have had reasonable expectations that the rules as to asbestos-related injury claims as they existed before September 1 would continue to apply beyond September 1 when Chapter 90, that's the statute in effect there, forewarned them that they would not. And that's the same position that we're in here. They entered into a dealer contract in 2009. It permitted either party to terminate the contract by giving written notice 30 days prior. In 2011, this is 2 years after the contract, the legislature enacted 57, and it provided that this kind of single-line dealer contract could only be terminated for cause. So it changes... Union Carbide didn't involve a contract situation. I get the conceptual analogy, but just as a strict matter of reading the holding of the case, it didn't involve a past contract that is terminable at any time. So it's not strictly within that case. Well, sure. I mean, it's not a strict... That's not a contract case. The principle applies. There's not been an impairment of contract case since the moratorium laws of the 1930s. Well, not actually, to my real question. Is this the type of case that we should consider certifying to the Texas Supreme Court? We've asked this court in our briefs to certify this question to the Supreme Court. We think the court can answer based on the legal arguments that we presented in our briefs today. By analogy to the Sinatsky case, by direct application of... Well, not direct application, but, again, analogy to the Sphine case, we think the principles are pretty clear. The legislature said that this chapter would apply to a dealer agreement that was entered into before the effective date of this act. So there's no question that the legislature was contemplating that this sort of arrangement would apply here, but its effective date would not occur until later. And so during this grace period, Doosan had a choice to make. Do we want to continue this relationship under a new regime that is going to take place in the future, or do we not? And they had the absolute right, without cause, to terminate that contract or to negotiate a new deal. So there has been no impairment of contract here. By distinguishing between the contract that I just mentioned and fixed-term contracts, the legislature of Texas viewed them as distinct and separate. A continuing contract, terminable at will, requires performance on a continuing basis. Rather than have a single term, the contract is defined by a series of successive performances. It's like the contract renews every 30 days. There's a new agreement every 30 days. These are a series of contracts lasting the duration of the notice period, capable of incorporating new legal changes. Indeed, it is settled in other contexts, and that's why you've seen in our brief that we refer to employment contracts. If an employee continues, and Texas is an at-will state, if an employee continues to work after receiving notice of a change in the terms of employment, typically this arises with arbitration agreements, new arbitration agreements. You want to keep working if you're going to give up your right to a jury trial. A new agreement incorporating the alternate term is inferred if the employee continues in that employment relationship. Likewise here, the parties have the notice of the new law. Now, the argument that we've presented to this court is not our original thought, not our original argument. It arose from this court's decision in North Shore, which we've quoted, and it has since been adopted by Maryland's highest court in the John Deere Construction v. Reliable Tractor case. But I want to say that even if this were some kind of impairment, it is still consistent with Texas law. Under the Robinson case, which is cited extensively by both sides, the Supreme Court of Texas and the Supreme Court of the United States have held that the extent of a contractual impairment is greatly diminished if there is a grace period. So if Doosan, with notice of this law, could have changed the arrangement, the relationship, that's a grace period that would have made the new law not effective as to that relationship. And they stood idly by. The grace period negates the reliance interests that they claim here. As the court held in Sinatsky, the party cannot have reasonable expectations that the old law will govern when they were forewarned that it would not. And this reminds me of a common dance that occurs at the end of just about every legislative session. The legislature passes a law, and then the lawyers rush to make sure that their claim is preserved in the new law. And so you'll see all kinds of lawsuits before expert witnesses were required in doctors' cases, the robust expert witness cases, or asbestos claims are filed early, or the insurance claims in the last session. Plaintiffs rushed because the insurance law was changed. That happens in every year that the legislature's been in effect. The contract clause also applies with diminished force to participants in heavily regulated industries. There's no question that Doosan knew that their manufacturing relationship with dealers was heavily regulated in Texas. In fact, it's heavily regulated across the states. This is something that occurs all the time. And it is very similar to auto dealers. The Texas legislature impacts auto dealers and regulates them heavily and their contracts with their dealers. The district court didn't agree with all of that, but it did reach the public policy arguments, and it took a look at whether Chapter 57 was justified and concluded that this chapter was not in the public interest, but it could do so only by elevating the court's own subjective beliefs about the statute's utility over the legislature's. This is a case where if you go to the Sessions laws, and we have quoted those Sessions laws, the legislature was very specific about the impact on the economy of dealer-manufacturer relationships that are terminable at will and how those have a devastating impact on the economy. And it's not just in the Doosan case. This is not a case like Robinson where the legislature specified, there's one person that we're trying to protect, and that is the successor to an asbestos manufacturer. And it was very clear that that was the single focus. This is a law that deals with industrial equipment, farm equipment. There are all kinds of different categories of equipment, heavy industrial use, that this applies to. It's not just Doosan, not just Amtec. It is a way to preserve the investment of a vital sector of the Texas economy, and that is public policy that the courts should provide deference to. And it's not the finding that the legislature made that this protects the general economy of the state and public welfare. It's not diminished simply because the dealers receive the most direct benefit. That is true of most laws, economic laws, including laws upheld in Sinatsky. That's the asbestos case that I mentioned. AV, which was a parental rights termination case for people, parents who are incarcerated, and Barshop, which had to do with water rights under the Edwards-Ockford. Each of those benefited a class of persons to the detriment of another class, yet the Supreme Court of Texas accepted the legislature's conclusion that they were in the public interest. I think this is really a philosophical question, and that is the extent to which the legislature has the power to determine what is in the public interest. And if you look at the Supreme Court of Texas jurisprudence, it's no surprise that the Supreme Court has not looked beyond the legislature's reasoning when evaluating a law's constitutionality, but has instead invalidated only those laws where the legislature gave no reasoning at all and where it was clear that the law was intended to retroactively benefit a single entity. So for all of these reasons, we do think that the Supreme Court of Texas should and could consider this, but we think the principles that we've established, the cases from the Supreme Court, from other courts, and from this court that was the genesis of the right that we're talking about today, should satisfy the court that the district court's judgment should be reversed. I'll reserve the remainder of my time. Thank you. May it please the court. The district court properly dismissed Amtec's claims against Doosan under the Texas statute at issue, and with good reason. Retroactively applying the 2011 statute to the 2009 contract would trap Doosan in a relationship to which Doosan never agreed. So you got trapped because you had... You can terminate it at any time. You know these arguments as well as I. Why doesn't that release you from the trap and fully express the protections of the Texas Constitution? Your Honor, if the act applies, we cannot terminate Amtec without good cause. We need to establish good cause. Before the statute was passed, we did not have to establish good cause. We could terminate Amtec for any reason whatsoever. So the relationship between Doosan and Amtec dramatically changes if Chapter 57 is read into the contract. And... As I understand it, the law was passed and signed on day one, and there was a period of time that elapsed before the law took effect. That's correct, Your Honor. So is opposing counsel right that there was that grace period where you could have terminated and thereby avoided the good cause requirement? Your Honor, there definitely was a 75-day grace period. The distinguishing fact here is that the critical right that was extinguished by the statute was Doosan's ability to terminate Amtec without cause. Well, that's right. You got that. I mean, that was the point of it. Right. And under no circumstance, Judge Ho, after the statute was passed, could Doosan have retained the right to terminate Amtec without cause? Well, you would surely agree that the legislature can say in all of your new contracts going forward with dealers, only termination for cause. No question the government could do that, right? Correct. Okay. So I take opposing counsel's point to be, well, if you don't like for cause, terminate all your dealer relationships before this law takes effect. Correct. And so I'm just acknowledging, make sure I understand, you don't dispute then that you all could have, during this grace period, said, I don't like termination for cause, so I'm just going to pull out. Correct. We could have left Texas altogether. We could have terminated Amtec, but we would have had to go to a new dealer, negotiate with a new dealer, subject to the terms of Chapter 57. I understand that. Doesn't that make it not retroactive? No, because in no circumstance could Doosan have fully preserved its rights that existed before the statute was passed. If you look at the law. Well, you're just saying that you don't like for cause. Yeah. You don't like the law, period. You don't like the new deal. We do not like the new deal, but we could not have continued in our relationship with Amtec without terminating for cause. So — All right. It seems to me what you're saying is you could not continue that relationship. I think I'm quoting you. That sounds like future conduct, not past conduct. The conduct at issue, Your Honor, is, as Your Honor pointed out earlier, the conduct is the formation of the contract. That is the critical — No, but you just said just now, and I think I don't blame you because I think you're acknowledging the truth, which is, yes, you had a past contract, but you didn't have to continue the relationship. You could have avoided this new law. You just decided you wanted to continue the relationship. And to my mind, that makes this a future conduct case rather than a past conduct case. Am I — tell me how I'm wrong about that. I think you are wrong, Your Honor, respectfully. I think the issue — the issue here is we continued pursuant to the 2009 contract. And unless Chapter 57 is read into that contract, the contract from 2009 continued. Counsel, it seems to me that the legislature is focusing on what we're talking about now, on continuing contracts. This idea of not having a specific term, so the harm, not from your viewpoint, but from the legislature's viewpoint, was basically permanent contracts, so long as both parties are satisfied, that have this particular right of termination. And it seems to me that you can't have both. You didn't want initially a term contract, so you do fall under these renewable at the time specified by the termination notice, so every 30 days. You had two of those 30-day periods of effective renewal during the 75-day grace period. I mean, all this is a way to interpret this statute and a way to really interpret the Constitution is what we're talking about. And you have a valid enough point, which seems to me, getting back to what Mr. Jefferson said, it makes perfect sense to certify this. We can make a ruling that has all the power and effect of the Fifth Circuit, but that doesn't mean nearly as much as the Texas Supreme Court making a statement about this. What's your response to Judge Hogan's and Judge Jefferson's suggestion? Your Honor, the issues presented certainly could be certified to the Texas Supreme Court. We believe that the Robinson test, which the Texas Supreme Court laid down in 2010, provides the guiding precedent here. Very subjective test. Having us weigh things that would be better weighed by Texas judges. Your Honor, the other point I would make on the certification question is, obviously, the case was originally filed in state court. It was removed to federal court on diversity jurisdiction. The defendants chose their forum in this case. Are they stuck with it? No. This court is obviously able to decide to certify questions to the Texas Supreme Court. That is an unusual circumstance that we don't believe is necessary here in life. That's an ironic circumstance. I wonder how unusual it is. I don't have statistics on that, Your Honor. I don't either. So perhaps it is not unusual. Proceed. That is on the table, possibility of certifying. Yes, it is, Your Honor. If I may briefly just touch on the Robinson test. It's a three-pronged test for determining whether or not Chapter 57 is unconstitutionally retroactive. The first prong is the nature and strength of the public interest as evidenced by the legislature's factual findings. And Robinson wrote, there must be a compelling public interest to overcome the heavy presumption against retroactive laws. The facts presented here are nowhere near like the facts presented in Barshop, which involved protecting natural resources located in Texas, AV, which involved protecting children, or even Sinatsky, which dealt with the asbestos litigation crisis in Texas. The only beneficiaries of Chapter 57 are a small group of dealers that were singled out for special reward, in this case for the passage of the statute. In addition, we would say that the sponsor of Chapter 57 specifically said the purpose was to level the playing field between manufacturers and dealers. And the U.S. Supreme Court has held that leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest. But this is all once you've proven that this is retroactive. Is it unconstitutionally retroactive? That's correct, Your Honor. If I may, I want to go back to the retroactivity question because I think that's, for me anyway, the more challenging. Do I understand correctly that the following is true? Let's say before the law was in effect, you enjoyed having a relationship with a dealer, Dealer A, but only if it was terminable at will. If you were forced to live in a four-cause regime, then you don't want to be with A, you want to be with Dealer B. You're more comfortable with Dealer B if it's four-cause. Did you have the opportunity here to switch? We had the opportunity to switch from being with Dealer A, being able to terminate without cause, to Dealer B, but we would not have been able to terminate that relationship without cause. With B. With B. That, under the statute... Do you have any case from Texas that says that despite the fact that you had that opportunity to switch, this is nevertheless retroactive? I do not, Your Honor. On the grace period issue, my point would be, if you look at Sanatsky, I think it's Lykes and Tenet Hospitals, in all three of those cases, the plaintiffs could have rushed to the courthouse, filed a lawsuit, and fully preserved their rights. So during the grace period, they could have fully protected themselves. And in those cases, it's not retroactive? Those cases all determined were not retroactive. Here, the distinguishing fact again, and I hate to belabor this, but we were in a relationship where we could terminate Amtec for any reason. Statute gets passed. If that statute is read into the contract, we couldn't terminate Amtec without cause, we couldn't terminate Dealer B without cause. The relationship that we had, the settled expectation in the ability to terminate Amtec without cause, was completely destroyed by Chapter 57. In no circumstance could we have continued that relationship. The other point I would make on the continuing contracts is Amtec refers to the North Shore case, which was a 1991 case from this court. That case actually held that a Louisiana statute was unconstitutionally retroactive under the U.S. contract clause. And the provision that Amtec relies upon is highly speculative dicta that we think has little bearing on the facts presented here. In addition, in the reliable tractor case that Amtec also relies upon for their continuing contract theory, that case wasn't even followed. After it was certified to the Maryland Court of Appeals, the Eleventh Circuit rejected the holding that it was a series of 120-day contracts. So even if you look at the authority that Amtec cites, it's not on point and not supportive of their argument. And we would respectfully refer this court to the Sixth Circuit case that Amtec cited on page 15 of its brief called Jack Tyler that is directly on point to the facts presented here. There you had a contract that was terminable, I believe, on 30 days' notice, the same way that this contract was terminable on 30 days' notice. A statute gets passed requiring good cause, and the Sixth Circuit says, no, it would be retroactive to apply the later-passed statute to the earlier contract. That case is directly on point to the facts presented here. We would ask that the court adopt the reasoning from the Jack Tyler case. And unless the panel has any other questions... Thank you. That's all. Thanks, Counsel. Good morning, and may it please the Court, Josh Mahoney, Counsel for Appellee Ellison Technologies. Your Honors, regardless of what this Court decides with respect to the constitutionality of Chapter 57, as to the two claims against Ellison, this case can be decided by the straightforward application of pleading standards to factual allegations in the pleadings. To determine whether Amtec met the Rule 12c pleading standard, we must look at Amtec's petition, which it never sought to amend. Whether Amtec stated a claim against Ellison is tethered to those allegations, notwithstanding Amtec's efforts to revise its allegations and claims through its briefs. Of the 45 paragraphs in Amtec's petition, only three in the body... Excuse me, of the 45 paragraphs in the body of Amtec's petition, only three reference Ellison, and they can be quickly summarized. Paragraph 36, Amtec alleges that in June 2015, it heard rumors that Amtec... Excuse me, Ellison approached Doosan about becoming Doosan's dealer in, quote, much of North America. In paragraph 38, Amtec alleges that Ellison was telling Amtec's customers in 2015 that it would, quote, soon be the exclusive distributor for Doosan. And in paragraph 41, Amtec alleges that Doosan decided to terminate the agreement so that it could appoint Ellison as its new dealer in Texas. Those are all of the allegations in the body of Amtec's petition. Now, with respect to the first claim against Ellison, tortuous interference with existing contract, Amtec adds in its account for this claim the additional... It incorporates the three allegations I just mentioned, and it adds a conclusory allegation that Ellison willfully and intentionally interfered with the contract. And it alleges, Your Honor, that Amtec... Excuse me, that Ellison did this by conspiring with Doosan to, quote, terminate Amtec's contract. There is nothing about interference with customer relationships. There is nothing about interference with the performance of the contract. Instead, by Amtec's allegations, the interference is the termination itself. Now, with respect to tortuous interference with an existing contract, Amtec had to plead factual allegations sufficient to satisfy the following elements. The first is a contract subject to the type of interference that is being alleged. Here, the termination. The second is an act of willful and intentional interference. Third, that the act of willful and intentional interference resulted in harm. And fourth, the harm itself. Your Honors, Amtec did not sufficiently plead those elements. It pleaded a contract that was not subject to the type of interference that's being alleged, the termination. It pleaded no facts showing that Ellison willfully and intentionally did anything to cause a breach of the agreement or interruption with the performance of the agreement. There are no facts to show that Ellison asked Doosan to terminate the agreement in a way that would violate its terms. And because those two elements fail, the following elements fail as well. And on that basis alone, judgment on the pleadings was the correct result. Now, what Amtec did sufficiently allege on the face of its pleadings and what the court may take judicial notice of is the defense of justification. It alleges that Ellison was Amtec's competitor, that it approached Doosan about replacing Amtec based upon an at-will termination contract. And, Your Honor, Amtec repeatedly makes the argument that Ellison must be charged with knowledge of the law. Your Honor, if we assume that Ellison must be charged with knowledge of Chapter 57, so, too, must we assume that Ellison is charged with knowledge of the highest law in Texas, that of the Texas Constitution's prohibition against retroactive statutes. And so, too, must we assume that Ellison has knowledge of the long-standing principle in Texas that only statutes enacted at the time of a contract's execution become implied terms. Amtec has not cited any cases that stand for the proposition that statutes enacted after execution of a contract may become implied terms. The Kirstead case, for example, cited in Amtec's reply brief, stands for the proposition, well-established in Texas, that only statutes enacted at the time of execution become implied terms. And so, Your Honor, on these facts, and this court has held that a defense may be adjudicated on a Rule 12b-6 or Rule C motion, it established as a matter of law that Ellison had a good-faith, colorable belief to go to Doosan and negotiate for the termination of Amtec, similar to the facts set forth in the ACS case. With respect to the other allegations that Amtec has argued form the basis of its tortuous interference claim, I note, Your Honors, that that was not appropriately presented to the district court in response to Ellison's motion for judgment on the pleadings. There was a citation to Amtec's request for a preliminary injunction. However, that citation was to have unsworn statements in the request itself. And even so, Your Honors, if we look at the additional allegations that Amtec tried to put forth, if we assume it was appropriate for any consideration on a Rule 12c motion, those allegations can be easily put aside because they're either irrelevant to the cause of action as pleaded, they are disconnected to any harm as pleaded, or they inappropriately conflate tortuous interference with prospective contracts and tortuous interference with existing contracts. Very quickly, Your Honors, with respect to the other claim against Ellison's civil conspiracy, first, we must appreciate the fact that Amtec never attempted to protect or preserve this claim when faced with the motions for judgment on the pleadings. Amtec pointed the court to its request for Rule 54 be in motion, but only in the context of its Chapter 57 claim, and that makes sense because those two submissions dealt exclusively with the legal and factual merits of the Chapter 57 claim. They don't mention the civil conspiracy claim. And when Ellison and Dusan pointed out to the court that Amtec had failed to address civil conspiracy in response to their motion for judgment on the pleadings, Amtec again remained silent. It did not seek to amend its pleading. It did not ask for leave to submit further submission to the court and clarify any misunderstanding. It remained silent. So, Your Honor, that claim has been waived. And even if it had been preserved, Your Honors, when you'd only looked at the petition to see that it is not a viable claim, paragraph 84 of Amtec's petition, it stated, quote, all defendants have been conspiring to unlawfully breach Amtec's contract with Dusan. It is well established in Texas that breach of a contract cannot serve as the basis of a civil conspiracy claim. Thank you, Your Honor. Just a quick, very quick response on Ellison. I'm going to point the court to three places in the record. This is from the original petition. Amtec alleged that Dusan had assigned Ellison this is your hypothetical, Dealer A, Dealer B, this is Dealer B that we sued for tortious interference. Dusan assigned Ellison exclusive marketing and distribution rights before the Amtec contract terminated. Months before the contract was terminated, Ellison was calling customers and telling them that it, instead of Amtec, would be handling the sale and servicing of Dusan's products moving forward. And in an affidavit attached to the petition, Jack Butts testified that Ellison took delivery of five Dusan machines before Amtec's contract was terminated. These are acts that happened prior to termination, and as the Supreme Court of Texas, we cited Exxon versus Rincones, says a contract until terminated is valid and subsisting, and third parties are not free to tortiously interfere with it. On the certification, counsel said it's unusual to certify. I can say with pretty good confidence it is not unusual. And in fact, from around 2001, maybe 2002, until the present day, there have been several certifications per year from the circuit to the Supreme Court, and unlike in prior years, once a question is certified, the Supreme Court immediately acts on it and accepts it. There's not been one certified question that has been denied in over a decade, more than 15 years. The Robinson case that counsel for Dusan mentioned, that was a case where there were literally no fact findings, and it was a single retroactive law to extinguish the liability of an asbestos successor, and the court said that's retroactivity, and that is unconstitutional, and it was a very thorough opinion by Chief Justice Heck. The Northstone, counsel says what the court held in Northstone is dicta. I don't believe in dicta. If the court says, announces a principle of law, I believe that parties are obliged to follow it, and that's what we have done here, and we're not the only one that has done this, and the idea of these continuing contracts is replete, not only in Texas, but throughout the country, that has the impact of not, of giving them a grace period if they had wanted not to be under the new legal regime of backtracking, cutting a new deal, or terminating Amtrak right away, before the contract came into effect. That's why it's not retroactive. It's also why it's not a contractual impairment, and for all of these reasons, Your Honor, we believe that the court should reverse and remand this case for trial, and in the alternative, certify a question to the Supreme Court of Texas on the constitutionality of Chapter 57, and on the legal question of tortious interference with an existing contract. And if there are no further questions, I'll give back the balance of my time. Thank you, Counsel. We thank all of you for bringing this case to us.